PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-2238
_____

SINGER MANAGEMENT CONSULTANTS, INC.;
LIVE GOLD OPERATIONS, INC.,

v.

ANNE MILGRAM,
Attorney General of the State of New Jersey

Live Gold Operations, Inc., Appellant

_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 2-07-cv-03929)
District Judge:  Honorable Dickinson R. Debevoise

_____

Argued before original panel on November 17, 2009
Petition for Rehearing En Banc granted September 1, 2010
Argued En Banc February 23, 2011

_____

Before:  McKEE, <u>Chief Judge</u>, SLOVITER, SCIRICA,
RENDELL, BARRY, AMBRO, FUENTES, SMITH,
FISHER, CHAGARES, JORDAN, HARDIMAN,
GREENAWAY JR., VANASKIE, ALDISERT
and ROTH, <u>Circuit Judges</u>

(Opinion filed:  June 15, 2011)

William L. Charron, Esquire (Argued)
Pryor Cashman
7 Times Square
New York, NY   10036
        Counsel for Appellant

Jeffrey A. Koziar, Esquire
Andrea M. Silkowitz, Esquire (Argued)
Office of Attorney General or New Jersey
124 Halsey Street
P.O. Box 45029
Newark, NJ   07102-0000
        Counsel for Appellee

_____

OPINION  OF  THE  COURT
_____

AMBRO, <u>Circuit Judge</u>, with whom SCIRICA, RENDELL,
BARRY, FUENTES, SMITH, FISHER, CHAGARES,
JORDAN, HARDIMAN, GREENAWAY, JR., and
VANASKIE, <u>Circuit Judges</u>, join.

        Does a party "prevail" within the meaning of 42 U.S.C.
§ 1988 if it obtains a temporary restraining order the day after
it files suit (after a hearing but before briefing from the

opposing side), but 22 days later is denied a preliminary injunction because the opposing party's voluntary change of position moots the case? Because we believe that Supreme Court precedent requires us to answer no, we affirm the same determination by the District Court.[1]

## I. Factual Background and Procedural History

Live Gold Operations, Inc. manages and promotes the music recording and performing groups known as "The Platters" and "The Cornell Gunter Coasters" pursuant to licenses of unregistered trademarks. In August 2007, the State of New Jersey learned that Live Gold had scheduled a two-week concert, to begin on August 18, of the Platters and Coasters groups at the Hilton Hotel in Atlantic City. The State informed Live Gold that its use of the trademarks "The Platters" and "The Cornell Gunter Coasters" might violate the New Jersey Truth in Music Act, which provides in pertinent part:

> A person shall not advertise or conduct a live musical performance or production through the use of an affiliation, connection or association between the performing group and the recording group unless:
>
> (a) The performing group is the authorized registrant and owner of a federal service mark for the group registered in the United

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

3

States Patent and Trademark Office; or

(b)  At least one member of the performing group was a member of the recording group and has a legal right by virtue of use or operation under the group name without having abandoned the name or affiliation of the group; or

(c)  The live musical performance or production is identified in all advertising and promotion as a salute or tribute; or

(d)  The advertising does not relate to a live musical performance or production taking place in this State; or

(e)  The performance or production is expressly authorized by the recording group.

N.J. Stat. Ann. § 2A:32B-2.

Live Gold responded by providing the State with evidence of its ownership of common law unregistered trademarks in each group's name and asserting that the unregistered trademarks should be considered "express authorizations" under subsection (e). Not satisfied that ownership of an unregistered trademark could comply with the Truth in Music Act, the State advised the Hilton Hotel that it could avoid liability under the Act by ticketing and

4

advertising the concert as a "tribute" or "salute" to the Platters and Coasters groups. Hilton complied.

On August 17, 2007, the day before the first Hilton concert, Live Gold sued the State, seeking a TRO and injunctive relief against its enforcement of the Truth in Music Act in the manner it advised. Live Gold argued, among other things, that the State's enforcement of the Act conflicted with the federal Lanham Act, 15 U.S.C. § 1125, and violated its civil rights.

At the TRO hearing before Judge Debevoise, Live Gold asserted that it had the right to conduct performances using its unregistered trademarks, and objected to the State's actions that caused the Hilton to label the groups' performances inaccurately as "tributes" or "salutes." The State responded that, because Live Gold's unregistered trademarks were not "express authorizations" under the Act, the Hilton concert must be billed as a tribute or salute. Judge Debevoise expressed doubts about the State's position:

> That is not what [Live Gold's groups] want to do. That is not what they say accurately describes them. So, in effect, the State is telling the Hilton to advertise or publicize this event in a way which is not in accordance with the description which these promoters of the events say is accurate.
>
> . . .
>
> I think there is sufficient problem with the State's position so that I

5

– there is a likelihood of success on the merits in this particular case.

. . .

[T]here may be substantial federal rights being impaired by the action of the State in this case, generally, under the statute . . . important federal rights are at issue, both freedom of speech rights under the Lanham Act and private rights to nonregistered trademark – trade name. Consequently, the Temporary Restraining Order will issue.

. . .

[W]e'll have an opportunity to get *to the merits* of this case on September 7th.

(Emphasis added.) The TRO "temporarily restrained and enjoined [the State] from interfering in any way with [the Hilton concert], and the marketing and promotion thereof."

On September 7, 2007, the parties returned to the District Court for a hearing on the preliminary injunction. In its written submission prior to the hearing, the State argued that an unregistered trademark satisfied the Truth in Music Act only if the performing group obtained express authorization from an original group member, included an original member, or denominated itself as a tribute or salute to the original group. The State contended that its

6

interpretation of the Act was consistent with the Lanham Act, the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. It also objected to Live Gold's suit on jurisdictional grounds.

Judge Debevoise began the preliminary injunction hearing by asking the State why it insisted on distinguishing between registered and unregistered trademarks: "Why shouldn't they proceed on an equal basis, two valid trademarks?" In response, the State contended that because the Lanham Act accorded a rebuttable presumption of validity to registered trademarks, its action here against unregistered trademarks was consistent with federal law. Judge Debevoise repeatedly rejected this argument, explaining that the differences under federal law between registered and unregistered trademarks for purposes of validity did not authorize the State to discriminate against an unregistered trademark, once proven valid. "There's no reason for it," he declared. Nevertheless, the State continued to press its interpretation of the Truth in Music Act. Judge Debevoise again rejected the State's position, stating, "Well, I fail to see it."

After rejecting the State's arguments, Judge Debevoise suggested that the State reconcile the Truth in Music Act with the Lanham Act by interpreting subsection (e) of the former to permit unregistered trademark holders to perform under their group names without any additional requirements. The State suddenly capitulated, effectively adopting Live Gold's interpretation of the Act. Incredulous, Live Gold objected that the State had made "a 180 degree shift in position." Judge Debevoise agreed, telling the State that the position in its brief was "contrary to what I [just] understood you to say." In response, the State explained that its previous position "was inadvertently put into the brief." The Judge then

7

declared that the State would be "bound" by its new interpretation of the Act.

Live Gold then moved for summary disposition, contending that it "should win" because the State had "admitt[ed] the allegations" in the complaint. Judge Debevoise observed that the State's new position resolved the "basic legal problem, which was an equal protection problem, a First Amendment problem, [and] a due process problem." He again took note of the State's "evolved" position, but saw no need to "go any further." He then announced:

> We have a statement by the State of New Jersey as to what the meaning of this statute is insofar as it relates to common law trademarks, and I think we've stated it. If there's a valid common law trademark under the Lanham Act, and if whoever has possession of it can establish a right to that possession, he is to be treated – or she is to be treated in the same way as the holder of a registered trademark. Now, no necessity of – to say or give any tribute to anybody. So we have an agreement on that.

The Court then vacated the TRO, which had already expired "by its own term[s] [after] 10 days, and . . . was directed primarily to the August performance at the Hilton." Having secured the State's position going forward, Judge Debevoise left open the option of continuing consideration of the preliminary injunction, but he found no need to convert the TRO to a preliminary injunction at that time.

Subsequently, Pryor Cashman LLP sought leave to move for an award of its attorney's fees and costs incurred in representing Live Gold. The issue was referred to Magistrate Judge Salas, who denied Pryor Cashman's application, concluding that Live Gold was not a "prevailing party" under 42 U.S.C. § 1988(b) because the State had voluntarily changed its position on the meaning of the Truth in Music Act.

Live Gold sought review of Judge Salas's order by the District Court. The State filed a motion to dismiss. Judge Debevoise addressed both issues in a hearing on March 16, 2009. At that hearing, he first addressed the State's motion to dismiss. Seeking to identify any unresolved constitutional issues, he asked the State to confirm that "[e]ven though literally . . . [the Truth in Music Act] might be interpreted to exclude [performing groups holding unregistered trademarks], it doesn't really do so and you're not interpreting it to do so." The State concurred, stating that "[t]he [revised] position we took on September 7, 2007, in this courtroom, is the position we're taking now." Judge Debevoise then obtained the agreement of all parties that the preliminary injunction hearing resolved Live Gold's constitutional claims, and asked, "Why shouldn't [Live Gold's complaint] be dismissed, other than [Pryor Cashman's] application for attorney's fees?" After hearing Live Gold's arguments, he remained unpersuaded, explaining "I just don't know what else there is to address. . . . In effect, [Live Gold] won the case."

Judge Debevoise then turned to Pryor Cashman's application for attorney's fees. After hearing from Live Gold, he asked, "State, why shouldn't you be responsible for attorney's fees[?]" In response, the State replied that a fee award was inappropriate because "there was no past enforcement action" and because it had never taken any

9

position on the Truth in Music Act. Judge Debevoise disagreed with the latter contention, reminding the State that it made a "180 degree change in position because [it] came in negating everything that [Live Gold] [was] urging, and in effect conceded [Live Gold] [was] right, and permitted everything to go forward." The State again distanced itself from its initial arguments, explaining that they were "not . . . as clear as they could have been" because the State was rushed in responding to the TRO application. The Court took the matter under advisement.

One month later, Judge Debevoise entered an order affirming the Magistrate Judge's order denying reimbursement of Live Gold's attorney's fees and granting the State's motion to dismiss. In his order, Judge Debevoise held that Live Gold was not a prevailing party because he "did not enter a preliminary injunction or any other order on the merits of the case." He also concluded that the State voluntarily changed its position, stating that "[w]hile it may be true that this court's involvement aided in the resolution of the constitutional issues between the parties, the fact remains that the issues were not resolved as the result of a court order." In granting the State's motion to dismiss, Judge Debevoise concluded that Live Gold's claims were moot in light of the parties' agreement that the preliminary injunction hearing had resolved all of Live Gold's constitutional claims. In this appeal, Live Gold challenges only the denial of attorney's fees.

## II. Governing Precedent

To be eligible to make a prevailing-party claim under § 1988, the plaintiff must, "at a minimum, . . . be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782,

792 (1989). The change must be "judicially sanctioned," *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001), and must "achieve[] some of the benefit the part[y] sought in bringing suit," *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (internal quotation marks and citation omitted). A "voluntary change in conduct . . . lacks the necessary judicial *imprimatur* on the change." *Buckhannon*, 532 U.S. 598-99. In other words, "a plaintiff does not become a 'prevailing party' solely because his lawsuit causes a voluntary change in the defendant's conduct." *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 232 (3d Cir. 2008) ("*PPAV*"). Rather, the change in the parties' legal relationship must be the product of judicial action. *See Buckhannon*, 532 U.S. at 605-06.

The Supreme Court so far has identified two resolutions that establish prevailing party eligibility: (1) judgments on the merits, and (2) court-ordered consent decrees (including settlement agreements enforced through consent decrees). *Id.* at 604. The first resolution contains two independent requirements: (1) a judgment (2) that was on the merits.[2]

## A.      The judgment requirement

A grant of summary judgment or a trial verdict in favor of the plaintiff is no doubt a "judgment." In contrast, a court's "judicial pronouncement that the defendant has violated the Constitution" does not create the requisite "material alteration of the legal relationship between the

---

[2] Live Gold does not argue that the second resolution, "court-ordered consent decree," is in play here, nor could it for the reasons discussed below. *See infra* note 3.

11

parties . . . until the plaintiff becomes entitled to enforce a judgment." *Farrar v. Hobby*, 506 U.S. 103, 112–13 (1992).

Thus, when an appellate court, in reversing the district court's dismissal of the plaintiff's claim, ruled that the plaintiff's constitutional rights were violated, the Supreme Court held that the plaintiff had not "prevailed" because there was no enforceable judgment. *Hewitt v. Helms*, 482 U.S. 755, 760 (1987). The only "relief" to the plaintiff from this appellate victory was "the moral satisfaction of knowing that a federal court concluded that his rights had been violated." *Id.* at 762.

### B.    The merits requirement

Any judgment must also be "on the merits." As recognized by the Supreme Court shortly after § 1988 was amended to allow attorney's fees, "Congress intended to permit the interim award of counsel fees *only* when a party has prevailed *on the merits* of at least some of his claims." *Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980) (*per curiam*) (emphases added); *see also id.* at 757 ("[I]t seems clearly to have been the intent of Congress to permit such an interlocutory award only to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal."). Similarly, the Supreme Court has observed that "[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." *Hewitt*, 482 U.S. at 760.

Indeed, in an area of the law that "has been framed in various ways," *Hensley*, 461 U.S. at 433, the merits-based requirement established in *Hanrahan* and *Hewitt* has been consistently repeated throughout the Court's "prevailing party" jurisprudence. *See Sole v. Wyner*, 551 U.S. 74, 82

12

(2007); *Buckhannon*, 532 U.S. at 603–04, 608; *Farrar*, 506 U.S. at 110–12; *Garland*, 489 U.S. at 790, 792. We have followed suit to hold that, to be entitled to prevailing party fees based on interim relief, relief must be "derived from some determination on the merits." *J.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 274 (3d Cir. 2002).

## III. Live Gold did not receive a "judgment on the merits," and therefore was not a prevailing party.

### A. The temporary restraining order was not issued on the merits.

In this case, we have a temporary restraining order. In *PAPV*, we held that injunctive relief "can, under appropriate circumstances, render a party 'prevailing.'" 520 F.3d at 233.

However, the "merits" requirement is difficult to meet in the context of TROs and preliminary injunctions, as the plaintiff in those instances needs only to show a *likelihood* of success on the merits (that is, a reasonable chance, or probability, of winning) to be granted relief. A "likelihood" does not mean more likely than not. *Cf. Hackett v. Price*, 381 F.3d 281, 290-91 (3d Cir. 2004). Because of this, we have held that a court's finding of "reasonable probability of success on the merits" is not a resolution of "any merit-based issue." *John T. v. Del. County*, 318 F.3d 545, 559 (3d Cir. 2003) (internal quotation marks and citation omitted). As this "probability" ruling is usually the only merits-related legal determination made when courts grant TROs and preliminary injunctions, it follows that parties will not often "prevail" based solely on those events.

Our decision in *PAPV* provides an example of that rare situation where a merits-based determination is made at the injunction stage. There, a rally organizer challenged the

13

constitutionality of an ordinance that required groups to prepay police protection costs before they could receive a permit for parades and rallies. *PAPV*, 520 F.3d at 229. At the first hearing in the case, the District Court granted the requested TRO after "concluding that [the ordinance] 'was facially unconstitutional,'" and that, even if the City voluntarily did not enforce the ordinance (as it had offered to do), "a permit regime devoid of any prescribed process would also be unconstitutional." *Id.* Therefore, the Court enjoined the City from enforcing the law, imposed its own temporary procedures governing permits, and directed the parties to meet and confer concerning a new proposal. *Id.* at 229–30. The City later proposed a revised ordinance, but the Court found it lacking, converted the TRO to a preliminary injunction, and requested further briefing. *Id.* at 230.

The City submitted a second revised ordinance, and in the meantime formally repealed the unconstitutional provision. *Id.* After this repeal, the City moved to dismiss the suit. *Id.* The Court denied the motion because no new procedures had taken the now-repealed ordinance's place, and a lack of guidelines was itself unconstitutional. *Id.* The injunction remained in effect for over two years until a new ordinance was enacted that satisfied the concerns of the Court. *Id.* Only then did it lift the injunction and close the case with the parties' agreement. *Id.*

The legal victories in *PAPV* are far from the events now before us. Judge Debevoise here never ruled, as did the *PAPV* Court, that the challenged law (or application of the law) was unconstitutional. *Id.* at 234. Instead, the TRO was based only on a "likelihood of success on the merits."[3] App.

---

[3] While Judge Debevoise suggested at the TRO hearing that the State's interpretation of the law posed "a very serious problem" and recognized "a significant risk there may be

187. In *PAPV*, the TRO prohibited enforcement of the challenged ordinance and affirmatively created new procedures to govern the City. The TRO in our case merely enjoined the State of New Jersey "from interfering in any way with live performances by [Live Gold's] . . . groups at the Hilton Hotel in Atlantic City, New Jersey, and the marketing and promotion thereof." The State remained free to enforce the Truth in Music Act (so long as it did not interfere with the Hilton performances).[4]

---

substantial federal rights being impaired by the action of the State," that will be true in almost all of these cases—§ 1988 deals with civil rights cases, which typically involve "very serious" and "substantial federal rights." Judge Debevoise acknowledged that "the State *maybe* has some merit to its position" (emphasis added), and stated it could resolve the merits "at a later date upon the return day of the Order to Show Cause."

[4] Contrary to the concerns expressed by Judge Roth, we do not mean to "cast[] doubt" on the "well-supported legal proposition" that, in some cases, interim injunctive relief may be sufficient to warrant attorney's fees. We agree that "interim relief remains a proper basis for an award of attorney's fees when that relief is based on a determination of the merits of the plaintiff's claims." We emphasize, however, that the determination must be merits-based, like the *PAPV* Court's decision that the challenged law in that case was unconstitutional, and may not be merely a finding of a likelihood of success on the merits, as in this case.

15

Therefore, the TRO here was not merits-based.[5]  As such, it does not confer eligibility for prevailing party status. We thus turn to whether anything occurred after the TRO to resolve the controversy on the merits and render Live Gold the prevailing party under § 1988.

> B.   **The State's actions after the TRO issued were voluntary, and no judgment was issued on the merits.**

There was no determination on the merits in this case because the State mooted the case at the preliminary injunction hearing by agreeing with Live Gold's position.  As noted, the Supreme Court has identified two formal resolutions that make a winning attorney eligible for a fee award:  (1) enforceable judgments on the merits, and (2) court-ordered consent decrees. *Buckhannon,* 532 U.S. at 604. *Buckhannon* characterized these two resolutions as "examples" of decisions that create the necessary material alteration of the legal relationship of the parties. *Id.* at 604–05.  There may be resolutions other than the two identified in *Buckhannon* that warrant prevailing party status (although the Supreme Court has yet to identify any).  But even if they are

---

[5] Judge Roth argues that the TRO was a "functional determination on the merits" because it "protected Live Gold from a potential enforcement action by the State" and allowed the concert series to proceed without being labeled a "tribute."  Thus, she contends, "Live Gold had largely obtained the relief it requested."  While this has surface appeal, the Supreme Court has told us it is not enough.  As we have explained, Live Gold did not obtain a judgment on the merits of its claim.  Without that, it is simply not entitled to attorney's fees.

merely examples, *Buckhannon* precludes the events in this case from qualifying as a third form of resolution that can support prevailing party status.

Some background helps to understand the sea change caused by *Buckhannon* in this area of the law. Prior to that decision, the rule in most circuits was that a plaintiff was a "prevailing party" if it "achieve[d] the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Id.* at 601–02. This became known as the "catalyst theory." *Id.*

For example, we held pre-*Buckhannon* that a plaintiff who could "prove that the existence of the lawsuit accomplished the original objectives of the lawsuit without a formal judgment c[ould] be a 'prevailing party.'" *Baumgartner v. Harrisburg Hous. Auth.*, 21 F.3d 541, 544 (3d Cir. 1994), *overruled by Buckhannon*, 532 U.S. at 602–05. We applied the "well-established" catalyst theory to allow attorney's fees when defendants "voluntarily changed their behavior to eliminate the complained-of conduct." *Id*. To support this theory, we relied in part on the policy consideration that "if defendants could deprive plaintiffs of attorney's fees by unilaterally mooting the underlying case by conceding to plaintiffs' demands, attorneys might be more hesitant about bringing these civil rights suits, a result inconsistent with Congress' intent in enacting section 1988." *Id.* at 548. Thus, we held that plaintiffs could be prevailing parties "notwithstanding the absence of a judgment or consent decree" so long as they "accomplished the original objectives of the lawsuit." *Id.* at 544, 551.

Were this the law governing us today, we would hold the prevailing party requirement satisfied, as Live Gold accomplished its objectives by filing a lawsuit that "catalyzed" the State to change its position voluntarily. In

17

*Baumgartner* it did not matter that there was no judgment or consent decree; because the "existence of the lawsuit accomplished the original objectives of the lawsuit," attorney's fees would be warranted. *Id.* at 544.

But *Buckhannon* overruled *Baumgartner*, and the latter is no longer the law. In *Buckhannon*, the Supreme Court reiterated that theretofore it had "only awarded attorney's fees" when the plaintiff obtained a "judgment on the merits" or a "court-ordered consent decree." 532 U.S. at 605. It had *not* awarded attorney's fees under the following circumstances: where the plaintiff acquired a "judicial pronouncement that the defendant has violated the Constitution unaccompanied by '*judicial* relief,'" *id.* at 606 (*quoting Hewitt*, 482 U.S. at 760) (emphasis in original); where the plaintiff "secured the reversal of a directed verdict," *id.* at 605–06 (citing *Hanrahan*, 446 U.S. at 759); or where there was a "nonjudicial alteration of actual circumstances," *id.* at 606 (citation omitted) (internal quotations marks omitted). The "catalyst theory" was added to this list, as there is no "judicially sanctioned change" in the parties' "legal relationship." *Id.* at 605. "A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.* Thus, the Supreme Court concluded, "the 'catalyst theory' is not a permissible basis for the award of attorney's fees . . . ." *Id.* at 610.

In so holding, it considered the same policy argument we raised in *Baumgartner*—that without the catalyst theory "defendants [could] unilaterally moot[] an action before judgment in an effort to avoid an award of attorney's fees"— but was not swayed. *Buckhannon*, 532 U.S. at 608–09. Thus,

however persuasive that argument may seem, it cannot influence our decision here.[6]

\* \* \* \* \*

The TRO Live Gold obtained was plainly not a "judgment on the merits." Judge Debevoise, who entered the TRO, certainly did not think so. At the preliminary injunction hearing the State chose to agree with the position pressed by the plaintiff. As that agreement resolved the constitutional issues, the case was mooted. Even if there are circumstances where a "judgment on the merits" or a "court-ordered consent decree" is not required for prevailing-party status, *Buckhannon* prevents the events in this case from qualifying.

Because no enforceable judgment on the merits issued in this case and the State's actions that mooted the case were voluntary, *Buckhannon* tells us that Live Gold was not a prevailing party. Given that precedent, we affirm.

---

[6] We doubt that the consequences of our decision today will be nearly as severe as Judge Aldisert foreshadows. In any event, our job is to follow Supreme Court precedent. Judge Aldisert writes about what the law should be, but we must deal with what the law is.

*Singer Management Consultants, Inc. v. Milgram*

No. 09-2238

---

**ROTH**, <u>Circuit Judge</u>, dissenting, with whom McKEE, <u>Chief Judge</u>, SLOVITER and ALDISERT, <u>Circuit Judges</u>, join.

"When does a party 'prevail' within the meaning of 42 U.S.C. § 1988?" That is the basic question that both parties here are asking. The Majority qualifies the question by referring to certain facts of record: "Does a party 'prevail' if it obtains a temporary restraining order the day after it files suit . . . but 22 days later is denied a preliminary injunction because the opposing party's voluntary change of position moots the case?" The Majority answers "No" to the question.

I would add different facts to the basic question – and, by doing so, I arrive at a different answer. My "different" qualifying facts are clearly found in the record of this case. Moreover, my facts support a finding of "prevailing party."

I acknowledge that the qualifying facts that the Majority depends upon are reflected in the record before us. As the Majority states, there was a temporary restraining order (TRO) granted. The Majority does not mention, however, that the TRO granted a large part of the relief plaintiffs sought.

Again, as the Majority states, there was no preliminary injunction (PI) granted when the parties returned for the September 7 hearing. But, insofar as Live Gold was asking to

enjoin the State's interference with the August concert, the issue was moot. The concert had been performed as Live Gold requested, that relief had been granted, and there was no further need to consider it. The issue remaining was whether the State would attempt to force other concerts by the holder of a valid common law trademark to be designated as "tributes" or "salutes." The State agreed that it would not apply the Act in such a way. Moreover, the PI, which would have addressed this issue, was not dismissed out of hand. The court left open the option of continuing consideration of the PI at a later time if necessary, explaining "[s]o I'm not setting a date, I'm vacating the temporary restraining order, and if there's any serious problems that arise which the plaintiffs think require emergent relief, they can ask for it to be rescheduled on short notice." (App. 389.) That the court felt that such relief would not be necessary is evident from the fact that the court had declared that the State would be "bound by" the State's new interpretation of the Act. (App. 387.) The court saw no need to "go any further." (App. 388.)

The court took note of the State's "evolved" position and then stated:

> We have a statement by the State of New Jersey as to what the meaning of this statute is insofar as it relates to common law trademarks, and I think we've stated it. If there's a valid common law trademark under the Lanham Act, and if whoever has possession of it can establish a right to that possession, he is to be treated – or she is to be treated in the same way as the holder of a registered trademark. Now, no

2

necessity of – to say or give any tribute to anybody. So we have an agreement on that.

(App. 388.) There was no dissent.

This conclusion by the court, that a valid common law trademark was to be recognized in the same way as a registered trademark, was the merits question put to the court by Live Gold – and the State of New Jersey was now bound in this action by this legal conclusion. I cannot imagine that the State would dare come again before the District Court and take any position contrary to the ruling of the court: "So we have an agreement on that." Nor, as I discuss later, would the State be in the position to contend in any future action before the New Jersey District Court that a valid common law trademark was not to be accorded the same recognition as a registered one. If it did so, the State would be barred by judicial estoppel.

With these facts in mind, I state my question as follows: "Does a party 'prevail' under the meaning of 42 U.S.C. § 1988 when it has obtained a TRO, granting an important part of the relief sought, and further when its opponent has been bound by the District Court to the position of law that grants *complete* relief on the merits of the complaint." I answer "Yes." I conclude from this factual setting, supported by the record, that Live Gold is clearly a prevailing party and, thus, deserves an award of its reasonable attorney's fees.

Moreover, this conclusion is within the boundaries of "prevailing party" as the Supreme Court has set them out. First, I agree with the Majority that the Court points to two

3

types of outcomes – judgments on the merits and consent decrees – that confer prevailing party status, and it cites one outcome – a voluntary change in conduct as a result of litigation – that does not. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 603-05 (2001). Nevertheless, as the Majority concedes, the Court has left the door open to other, yet to be defined, results that may confer prevailing party status. *See ante*, 16-17.

The Court has articulated two factors relevant to the prevailing party inquiry: (1) whether there is a "judicially sanctioned change in the legal relationship of the parties," *id.* at 603, that "achieves some of the benefit the part[y] sought in bringing suit," *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (internal quotation marks and citation omitted), and (2) whether the party "receive[s] at least some relief on the merits of his claims," *Buckhannon*, 532 U.S. at 604 ("'It seems clearly to have been the intent of Congress to permit . . . an interlocutory award only to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal.'" (quoting *Hanrahan v. Hampton*, 446 U.S. 754, 757 (1980))).

The Majority contends, however, that Live Gold did not receive a judgment on the merits. The Majority does agree that the TRO Live Gold obtained constituted a judgment and that injunctive relief "can, under appropriate circumstances, render a party 'prevailing.'" *See ante*, 13 (quoting *People Against Police Violence v. City of Pittsburgh* (*PAPV*), 520 F.3d 226, 233 (3d Cir. 2008)). But, I part ways with the Majority on its conclusion that the TRO here was not a resolution on the merits.

4

I find it clear that the TRO obtained by Live Gold was a "judicially sanctioned change in the legal relationship" between Live Gold and the State of New Jersey. The TRO allowed Live Gold to achieve much of the benefit it sought in bringing suit and provided some relief on the merits of its claims. Before the TRO hearing, New Jersey indicated that Live Gold could be penalized if the Platters and the Coasters were not billed as "tribute" bands. After the District Court issued the TRO, the bands were permitted to perform under the names "Platters" and "Coasters" without modifiers like "tribute" or "salute to," and the State was prohibited from penalizing Live Gold for doing so.

Perhaps, the Majority balks at the straightforward conclusion that there was relief here on the merits because it fears that "consent decrees" and "judgments on the merits," or their equivalents, are the only types of outcomes that confer prevailing party status. However, as the Majority seems to concede, there is little doubt that a plaintiff who gains preliminary relief may be a prevailing party. The Supreme Court has not disturbed the longstanding rule that "'plaintiffs may be considered 'prevailing parties' for attorneys' fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit,'" *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (quoting *Hensley*, 461 U.S. at 433), as long as the relief obtained provides at least some relief on the merits, *see Buckhannon*, 532 U.S. at 604, and consists of a judicially sanctioned change in the legal relationship of the parties, *see Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (*per curiam*) (plaintiff not prevailing party where declaratory

5

judgment was entered after his death and thus could not change his legal relationship to defendants).[1]

Moreover, the precedent of this Circuit – and that of every other circuit but one – is clear that interim injunctive relief can, in appropriate cases, constitute a "court-ordered change in the legal relationship between the plaintiff and the defendant" to confer prevailing party status. *See PAPV,* 520 F.3d at 232-33 (concluding that "relief on the merits achieved in the form of a preliminary injunction can confer 'prevailing party' status") (internal quotations omitted).[2] The Majority's

---

[1]*Farrar* makes clear that the benefit need not be significant. There, the Court held that a plaintiff awarded nominal damages is a prevailing party, because the award "modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay." 506 U.S. at 113.

[2]*Accord McQueary v. Conway*, 614 F.3d 591, 596-602 (6th Cir. 2010) (opining on whether granting a preliminary injunction may render a party prevailing always, sometimes, or never, and favoring an award when the interim relief indicates probable success on the merits and effects "a lasting change in the legal relationship between the parties"); *Lorillard Tobacco Co. v. Engida*, 611 F.3d 1209, 1217 (10th Cir. 2010) ("[T]o be a prevailing party on the basis of a preliminary injunction requires 'relief on the merits' . . . ."); *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 102 (2d Cir. 2009) ("the entry of an enforceable judgment, such as a stay or preliminary injunction, may permit the district court to confer prevailing-party status on the plaintiff notwithstanding the absence of a final judgment on the underlying claim"); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1355-56 (11th

6

Cir. 2009) (awarding prevailing party status to plaintiffs that had obtained a preliminary injunction, but were later denied a permanent injunction as a result of intervening legislation); *Dearmore v. City of Garland*, 519 F.3d 517, 524-26 (5th Cir. 2008) (noting the absence of Supreme Court authority on point and variety in the circuits' handling of the issue and applying its own three-part test to find that granting a preliminary injunction conferred prevailing party status); *Advantage Media, LLC v. City of Hopkins*, 511 F.3d 833, 837 (8th Cir. 2008) (recognizing "a preliminary injunction can in some instances carry the judicial imprimatur required by *Buckhannon* to convey prevailing party status," but finding that final judgment in the case before it reversed the effect of the preliminary injunction); *Dupuy v. Samuels*, 423 F.3d 714, 723, 723 n.4 (7th Cir. 2005) (affirming that a preliminary injunction may justify an award of attorney's fees based on prevailing party status); *Watson v. Cnty. of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002) ("A preliminary injunction issued by a judge carries all the 'judicial imprimatur' necessary to satisfy *Buckhannon*."); *Race v. Toledo-Davilla*, 291 F.3d 857, 859 (1st Cir. 2002) ("an individual may be entitled to attorney's fees without having obtained a favorable final judgment following a full trial on the merits, but he must obtain relief based on the merits of at least some of his claims.") (internal citations and quotations omitted)); *but see Smyth v. Rivero*, 282 F.3d 268, 274-78 (4th Cir. 2002) (expressing doubts as to whether a preliminary injunction may confer prevailing party status); *cf. PAPV*, 520 F.3d at 232-33, 233 n.4 (noting that the Fourth Circuit is the "only one arguably dissenting Court of Appeals" (citing *Smyth*, 282 F.3d at 276-77)).

7

analysis casts doubt upon this well-supported legal proposition. I hope, however, that this Court will continue to recognize that interim relief remains a proper basis for an award of attorney's fees when that relief is based on a determination of the merits of a plaintiff's claim.

Furthermore, the Majority's conclusion that the TRO in this case was not granted "on the merits" suffers from the failure of the Majority to offer a definition or test for when a decision is "on the merits" in a case involving the grant of preliminary relief. Rather, the Majority states merely that "the 'merits' requirement is difficult to meet in the context of TROs and preliminary injunctions," and that the "decision in *PAPV* provides an example of that rare situation where a merits-based determination is made at the injunction stage." *Ante*, 13. This conclusion is confusing in light of the Majority's acknowledgment that to obtain a TRO or preliminary injunction, the plaintiff needs to "show a *likelihood* of success on the merits." *Id.*; *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008). One would expect that when a plaintiff makes a sufficient showing of likelihood of success on the merits to obtain "an 'extraordinary and drastic remedy,'" a remedy that is "never awarded as of right," *Munaf*, 533 U.S. at 689-90, this victory would frequently result in prevailing party status.[3]

---

[3]The Majority attempts to evade this common-sense conclusion by mistakenly arguing that "'likelihood' does not mean more likely that than not." *Ante* at 13 (citing *Hackett v. Price*, 381 F.3d 281, 290-91 (3d Cir. 2004).) But *Hackett* was not a preliminary injunction case – it was a habeas case concerning the constitutionality of jury instructions at the penalty phase of a capital case, where the question was

8

Instead, the Majority argues that a preliminary injunction reflects a determination on the merits only in a case like *PAPV*, where the court granted a preliminary injunction lasting two years, and stated that the challenged statute was "facially unconstitutional." While it was clear in *PAPV* that the District Court's determination was "on the merits," I disagree with the Majority's suggestion that such elaboration of facts is required. This Court's post-*Buckhannon* precedents have never applied such a standard. Rather, in *J.O. v. Orange Twp.*, we stated simply that plaintiffs "who achieve favorable interim relief may be entitled to prevailing party attorney's fees as long as the interim relief granted derived from *some determination* on the merits." 287 F.3d 267, 274 (3d Cir. 2002) (emphasis added). Contrary to the Majority's reasoning, *PAPV* did not distinguish "reasonable probability" from "more likely than not," nor did it consider whether the district court had found that the plaintiffs were more likely than not to prevail on their

---

"whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 290. *Hackett* acknowledged that "[a]s one definition of 'likely' is 'having a better chance of existing or occurring than not,' *Webster's Third New International Dictionary* 1310 (1971), someone could plausibly argue that 'reasonable likelihood' is not a lesser standard than 'more likely than not.'" Indeed, "courts use a bewildering variety of formulations of the need for showing some likelihood of success." 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.3 (2d. ed. 2010).

claims. It simply noted that, as was the case here, the grant of preliminary injunctive relief reflected a "finding of a likelihood of plaintiff's success on the merits." *Id.* at 233.

I submit that the proper test to determine whether interim relief is on the merits is to distinguish (1) whether the relief is a "'stay put' order[] which merely serve[s] to maintain the status quo *pendente lite*" and which "do[es] not afford meaningful relief on the merits of the underlying claims," *PAPV*, 520 F.3d at 226 (citing *John T. ex rel. Paul T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 558-59 (3d Cir. 2003)), or (2) whether the relief "placed a judicial imprimatur on plaintiffs' entitlement to substantially all the relief they sought in the complaint." 520 F.3d at 233.[4]

---

[4]We address temporary restraining orders and preliminary injunctions together, as the two share nearly identical factors which courts evaluate in granting such interim relief and, in certain circumstances, have identical legal effect. *See Miller v. Mitchell*, 598 F.3d 139, 145 (3d Cir. 2010). The most significant differences are that temporary restraining orders may be issued with little or no notice and may dissolve on their own accord. *Id.* (discussing Fed. R. Civ. P. 65(b)(2)). Nevertheless, temporary restraining orders, like preliminary injunctions, may touch on the merits of a case to sufficiently alter the legal relationship between parties to confer prevailing party status. *See* Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies."); *Robinson v. Lehman*, 771 F.2d 772, 782 (3d Cir. 1985) ("The denial of a temporary restraining order is not generally appealable unless its denial decides the merits of the case or is equivalent to a dismissal of the claim.").

Several circuits, in considering this issue, have adopted similar rules. *See, e.g.*, *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 106 (2d Cir. 2009) ("a plaintiff's request for a temporary restraining order may be sufficient grounds to grant attorney's fees to the plaintiff pursuant to 42 U.S.C. § 1988(b)[,]" as long as the temporary restraining order addresses the merits of the case and does not "merely maintain[] the status quo"); *Dearmore v. City of Garland*, 519 F.3d 517, 524 (5th Cir. 2008) ("Under these facts, to qualify as a prevailing party under § 1988(b), we hold that the plaintiff (1) must win a preliminary injunction, (2) based upon an unambiguous indication of probable success on the merits of the plaintiff's claims as opposed to a mere balancing of the equities in favor of the plaintiff, (3) that causes the defendant to moot the action, which prevents the plaintiff from obtaining final relief on the merits."); *N. Cheyenne Tribe v. Jackson*, 433 F.3d 1083, 1086 (8th Cir. 2006) (noting that "some preliminary injunctions are sufficiently akin to final relief on the merits to confer prevailing party status," whereas others that "merely maintain[] the status quo do[] not confer prevailing party status"); *Dubuc v. Green Oak Twp.*, 312 F.3d 736, 753 (6th Cir. 2002) (concluding that granting a preliminary injunction may confer prevailing party status if the injunction represents "an unambiguous indication of probable success on the merits, and not merely a maintenance of the status quo ordered because the balance of equities greatly favors the plaintiff" (internal quotation omitted)).

This well-established rule has several advantages. First, it properly focuses the inquiry on whether the plaintiff obtained relief based on the merits of its claims rather than other interim relief factors. *Compare PAPV*, 520 F.3d at 232-

11

33 (noting district court's repeated findings of unconstitutionality) *with John T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 556 (3d Cir. 2003) (noting that TRO was merely to preserve status quo so that court could consider the merits of plaintiff's claims).

Second, this rule avoids the concerns voiced in *Buckhannon* and by the Majority that the catalyst theory is being revived: the test focuses on the nature of the district court's findings, not the defendant's response to those findings or its motivations.

Third, this rule promotes judicial efficiency in a significant class of civil rights cases where the plaintiff essentially challenges government policies prohibiting a discreet course of action in the future, such as advertising for a concert or demonstrating in front of city hall. The practical reality in such cases is that a TRO or preliminary injunction that enables the plaintiff to do what it wants to do, *i.e.*, advertise for a concert or demonstrate, is often all the relief the plaintiff wants or needs. It may be counterproductive and wasteful of judicial resources to require a plaintiff to insist on a final order that it no longer needs before it can be considered a prevailing party and obtain attorney's fees.

When the proper test is applied, it becomes clear that the TRO granted to Live Gold provided "at least some relief on the merits of . . . [the] claims," *Buckhannon*, 532 U.S. at 604. In *PAPV*, this Court emphasized that:

> (1) the trial court, based upon a finding of a likelihood of plaintiffs' success on the merits, entered a judicially enforceable order granting

12

> plaintiffs virtually all the relief they sought, thereby materially altering the legal relationship between the parties; (2) the defendant, after opposing interim relief, chose not to appeal from that order and remained subject to its restrictions for a period of over two years; and (3) the defendant ultimately avoided final resolution of the merits of plaintiffs' case by enacting new legislation giving plaintiffs virtually all of the relief sought in the complaint.

520 F.3d at 233.

The result here is substantially similar: the District Court found that Live Gold was likely to succeed on the merits of its claims, it entered a TRO affording Live Gold the most significant relief it sought, the right to advertise and to present the August concert outright, and not as a "tribute." As a result, the State was "temporarily restrained and enjoined from interfering in any way with live performances by Plaintiffs' respective groups at the Hilton Hotel in Atlantic City, New Jersey, and the marketing and promotion thereof." (App. 190.) The District Court clearly indicated that it considered the merits of the substantive legal issues during the TRO hearing and granted the TRO in light of its view on those issues:

> I think there is sufficient problem with the State's position so that I – there is a likelihood of success on the merits in this particular case.
> . . .

13

> [T]here may be substantial federal rights being impaired by the action of the State in this case, generally, under the statute . . . important federal rights are at issue, both freedom of speech rights under the Lanham Act and private rights to nonregistered trademark – trade name. Consequently, the Temporary Restraining Order will issue.

(App. 187-88.)

The District Court's statement that it will "have an opportunity to get to the merits of this case on September 7th [at the preliminary injunction hearing]" does not nullify its determination on the merits that the August concert proceed as Live Gold requested; it indicates only that the court planned to consider whether Live Gold deserved further relief for future concerts.

In addition, the TRO obtained in this case cannot be characterized as a "stay put" order or relief *pendent lite*. Rather, in the present case, the District Court's issuance of a TRO effectively gave Live Gold a complete victory on one important issue in the litigation. The musical groups being promoted by Live Gold – "The Platters" and "The Cornell Gunter Coasters" – were scheduled for a two-week engagement at the Hilton Hotel to begin on August 18. On August 17, the day before the first Hilton concert, Live Gold sought and obtained the TRO preventing the State from enforcing the Truth in Music Act in relation to the performances at issue. By the time Live Gold and the State returned to court on September 7, for a hearing on the preliminary injunction, the concert series had already

14

concluded – and not as a "tribute." Thus, at that point, the TRO had protected Live Gold from a potential enforcement action by the State, and Live Gold had largely obtained the relief it requested.

In this light, the TRO Live Gold obtained was a functional determination on the merits. It exalts form over substance to claim, as the Majority does, that Live Gold has not succeeded on the merits when what Live Gold wanted to do was to promote and present without interference from the State musical groups for which it held a valid common law trademark. The District Court issued a TRO – clearly premised on the merits of the claims at issue – compelling the State to permit Live Gold to do just that. In this case, Live Gold fits comfortably within "our respect for [the] ordinary language" definition of "prevailing party." *Buckhannon*, 532 U.S. at 603.

In addition to the judicial order here, the District Court permanently altered the legal relationship between the parties. The court's statement that the State would be "bound" by its new interpretation of the Act should bar the State from taking any inconsistent positions in future litigation because of the doctrine of judicial estoppel. Judicial estoppel is an equitable doctrine that entails "'the intrinsic ability of courts to dismiss an offending litigant's complaint without considering the merits of the underlying claims when such dismissal is necessary to prevent a litigant from playing fast and loose with the courts.'" *In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010) (quoting *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319-20 (3d Cir. 2003)). "[T]he basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain

15

an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Krystal Cadillac*, 337 F.3d at 319 (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996)). "Though there is no rigid test for judicial estoppel, three factors inform a federal court's decision whether to apply it: there must be (1) 'irreconcilably inconsistent positions;' (2) 'adopted . . . in bad faith;' and (3) 'a showing that . . . estoppel . . . address[es] the harm and . . . no lesser sanction [is] sufficient.'" *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) (quoting *Chao v. Roy's Constr., Inc.*, 517 F.3d 180, 186 n.5 (3d Cir. 2008)).

Here, once the State had reversed course and accepted that a valid common law trademark must be treated in the same way as a registered trademark, the State would be judicially estopped from adopting a contrary interpretation of the Act in any subsequent judicial proceeding and certainly in any proceeding against Live Gold. This is the significance of the District Court's statement that the State was "bound" to its new interpretation. Moreover, it showed that the District Court must have relied on this commitment by the State when the court did not enter a permanent injunction against the State. If the State were to assert again that the Truth in Music Act does not recognize valid common law trademarks, it would be asserting an inconsistent position in presumptive bad faith after already having conceded the wrongfulness of such an assertion. Judicial estoppel, therefore, would apply to prevent the State from perpetuating a fraud on the court. *See New Hampshire*, 532 U.S. at 751 (noting that a court addressing judicial estoppel should consider "whether the party seeking to assert an inconsistent position would derive

an unfair advantage or impose an unfair detriment on the opposing party if not estopped").

In conclusion, we see that the District Court's binding of the State resulted in "a court-ordered 'chang[e] [in] the legal relationship between [the plaintiff] and the defendant'" necessary to permit an award of attorney's fees. *Buckhannon*, 532 U.S. at 604. In this sense, the State's voluntary concession and the District Court's "binding" of the State to that position would prevent the State from taking contrary positions in future litigation; it can be analogized to the voluntary action of a consent decree: in both instances, voluntary conduct formalized by a court results in a material alteration in the legal relationship between the parties.

Moreover, requiring a party to go further than Live Gold did in this case by obtaining a judgment or consent decree would endanger the practical, efficient, and informal resolution achieved by the District Court in this case. I suspect that Live Gold would never have accepted the District Court's resolution of the case in the way it did if it had it known that it would not be a prevailing party. Live Gold would have insisted on greater judicial formalization of the change in the State's position, a consent decree, or the like. The Majority's insistence on a "judgment," rather than *Buckhannon*'s broader "judicial imprimatur," will only unnecessarily drag out cases and lead to judicial inefficiency. The essential question in the prevailing party inquiry is whether the party has obtained a judicial alteration of the legal relationship between the parties. Live Gold certainly accomplished that.

Under these circumstances, an award of attorney's fees is consistent with Supreme Court precedent, *see Buckhannon*, 532 U.S. at 603, and required by this Court's precedent, *see PAPV*, 520 F.3d at 232-33.

For the reasons set forth above, I respectfully dissent. I would confer prevailing party status to Live Gold and award it its attorney's fees.

<u>Singer Management Consultants, Inc.; Live Gold Operations, Inc. v. Annie Milgram</u>, No 09-2238

ALDISERT, <u>Circuit Judge</u>, dissenting.

As I join in all respects the dissenting opinion of Judge Roth, I deem it necessary to add these observations regarding civil rights cases proceeding under 42 U.S.C. §§ 1983 and 1988. How a judge applies the Supreme Court's decision in <u>Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources</u>, 532 U.S. 598 (2001), to this case depends on the judge's philosophy of law, jurisprudence, and jurisprudential temperament, which inform the decision to come to grips with whether or not an action is "judicially sanctioned." The Majority holds that the decisions of the trial judge on the record in this case did not qualify as "judicially sanctioned" actions. I am equally convinced that they did.

Before setting forth detailed support for my view, it is necessary to emphasize the specific <u>holding</u> or <u>decision</u> of the Court in <u>Buckhannon</u> because it is the decision, and not the reasoning, that forms the precedent. The expression stare decisis is but an abbreviation of <u>stare decisis et non quieta movere</u> (to stand by or adhere to decisions and not disturb that which is settled). "Decisis" means, literally and legally, "the decision." The doctrine is not "<u>stare dictis</u>" ("to stand by or keep to what was said"). Nor is the doctrine <u>stare rationibus decidendi</u> ("to keep to the reasoning of past cases"). Rather, a case is important for what it <u>decides</u>: for "the what," not "the why," and not "the how." Thus, stare decisis means what the court <u>did</u>, not what it <u>said</u>.

1

The Court in Buckhannon stated: "we hold that the 'catalyst theory' is not a permissible basis for the award of attorney's fees under the [Fair Housing Amendments Act of 1988, or the Americans with Disabilities Act of 1990]." 532 U.S. at 610. Earlier, the Court had explained that attorney fees should not be awarded pursuant to the catalyst theory because that theory "allows an award where there is no judicially sanctioned change in the legal relationship of the parties." Id. at 605. Thus, the issue for decision in this case is whether there was such judicially sanctioned change.

Today the Majority makes clear that the Supreme Court has not precluded the possibility that a "judicially sanctioned" change may include events other than a judgment on the merits or a consent decree:

> As noted, the Supreme Court has identified two formal resolutions that make a winning attorney eligible for a fee award: (1) enforceable judgments on the merits, and (2) court-ordered consent decrees. Buckhannon, 532 U.S. at 604. Buckhannon characterized these two resolutions as "examples" of decisions that create the necessary material alteration of the legal relationship of the parties. Id. at 604–05. There may be resolutions other than the two identified in Buckhannon that warrant prevailing party status (although the Supreme Court has yet to identify any).

Maj. Op. at 16. To hold as does the Majority that "[b]ecause no enforceable judgment on the merits was issued in this case, and the State's actions that mooted the case were voluntary,

2

Buckhannon tells us that Live Gold was not a prevailing party," Maj. Op. at 19, is to apply a philosophy of jurisprudence no longer in general acceptance—conceptual jurisprudence, a philosophy that preaches that a principle, if sound, ought to be applied wherever it logically leads, without reference to ulterior results—and wholly inappropriate for cases that touch upon civil rights.

Without a nod to the effects on future civil rights cases, the Majority fashioned a major stumbling block to success for civil rights plaintiffs in cases based on § 1983. The plaintiff here was: (1) victorious on the merits in obtaining a temporary restraining order, duly recorded and altering the position of the parties, and (2) able to persuade the District Court at the preliminary injunction hearing that formal registration of their mark was unnecessary. That the District Court told the plaintiff, "in effect [you've] won the case," shows that Live Gold was, in effect, the prevailing party on the merits.

I.

I am proud of this Court's civil rights history from as far back as 1939, when this Court upheld First and Fourth Amendments rights in Hague v. Committee of Industrial Organization, 101 F.2d 774 (3d Cir. 1939), aff'd and modified, 307 U.S. 496 (1939). Introducing his opinion for our Court, Judge Biggs wrote: "The question presented by the appeal at bar is whether or not certain fundamental civil liberties safeguarded by the Constitution of the United States shall be observed and protected in Jersey City or shall there stand abridged." Id. at 777. Thus, more than 20 years before the resuscitation of 42 U.S.C. § 1983 in Monroe v. Pape, 365 U.S. 167 (1961), this Court was in the business of expanding,

3

not contracting, civil rights protections.[1] Until today. Until a Majority of this Court embarked on a jurisprudential

---

[1] See, e.g., Albright v. Oliver, 510 U.S. 266, 270 n.4 (1994) (identifying the Third Circuit as having "[t]he most expansive approach" among the courts of appeals as to the extent to which a claim of malicious prosecution is actionable under § 1983 (citing Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir. 1988) (Becker, Hutchinson, Scirica))); Pfeiffer by Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d 779, 788 (3d Cir. 1990) (Higginbotham, Scirica, Aldisert) (diverging from other courts of appeals to hold that compensatory relief is available for certain Title IX violations), abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246 (2009); Melo v. Hafer, 912 F.2d 628, 635 (3d Cir. 1990) (Sloviter, Becker, Stapleton) (holding that state officers sued in their individual capacities are "persons" for the purposes of § 1983), aff'd, 502 U.S. 21 (1991); E.E.O.C. v. Univ. of Pa., 850 F.2d 969 (3d Cir. 1988) (Becker, Hutchinson, Scirica) (holding that under the circumstances and in light of the purposes of Title VII of the Civil Rights Act of 1964, the first-filed rule did not govern the case), aff'd, 493 U.S. 182 (1990); Al-Khazraji v. Saint Francis Coll., 784 F.2d 505, 514–517 (3d Cir. 1986) (Adams, Gibbons, Stapleton) (providing a broad definition of "race" under 42 U.S.C. § 1981), aff'd, 481 U.S. 604 (1987); Ricks v. Del. State Coll., 605 F.2d 710, 712 (3d Cir. 1979) (Adams, Rosenn, Higginbotham) (identifying the "humanitarian and remedial purpose" of Title VII to hold that its limitations period does not run until termination of employment), rev'd, 449 U.S. 250 (1980); Goode v. Rizzo, 506 F.2d 542 (3d Cir. 1974) (Staley, Gibbons, Weis) (upholding a

adventure that makes it unnecessarily difficult for civil rights plaintiffs who seek to enforce federal rights and statutes. The Majority does so by erecting roadblocks before plaintiffs who seek to qualify as a "prevailing party" under § 1988.

The Majority employs a stingy interpretation of "judicially sanctioned," declaring that there was no act of sanctioning notwithstanding that: (1) the District Court entered a Temporary Restraining Order based on the merits, and (2) in the subsequent preliminary injunction hearing the District Court told the defendant that it completely agreed

district court's finding that violations of constitutional rights by Philadelphia police occurred in a high number of instances and allowing injunctive relief), rev'd, 423 U.S. 362 (1976); Hackett v. McGuire Bros., Inc., 445 F.2d 442, 446 (3d Cir. 1971) (McLaughlin, Aldisert, Gibbons) (concluding that the phrase "by a person to be aggrieved" in Civil Rights Act of 1964 showed "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution"), quoted approvingly by Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 (1972), abrogated by Thompson v. N. Am. Stainless, LP, 131 S. Ct. 863, 869 (2011); Douglas v. City of Jeannette, 130 F.2d 652 (3d Cir. 1942) (Biggs, Maris, Jones, Goodrich) (holding that federal courts have jurisdiction over alleged deprivations of constitutional rights pursuant to the Civil Rights Act of 1871), aff'd, 319 U.S. 157 (1943); Minersville Sch. Dist. v. Gobitis, 108 F.2d 683 (3d Cir. 1939) (Biggs, Clark, Kalodner) (affirming an injunction against compulsory flag salutes in schools), rev'd, 310 U.S. 586 (1940), overruled by W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943).

with the plaintiff, (3) the defendant conceded that the State of New Jersey would be bound by the District Court's interpretation of the trademark, (4) the plaintiff moved for entry of summary judgment in its favor, and (5) the District Court declared entry of summary judgment was unnecessary because, "I just don't know what else there is to address . . . in effect, [Live Gold] has won the case."

The Majority nonetheless contends that although Live Gold won the case, the win was not "judicially sanctioned" because the District Court did not enter on the record five words: "Plaintiff's summary judgment motion granted," or four words "Judgment ordered for plaintiff."

The Majority nonetheless contends that although the District Court told the parties that the plaintiff won the case, the win was not "judicially sanctioned" because the District Court did not formally enter its decision on the record. The Majority's interpretation of "judicially sanctioned" is reminiscent of the writ-based common law pleading rules, which were so inflexible that a plaintiff that used the wrong writ was out of court. It was a system "that had become rigid and rarified" and a system in which "a party could easily lose on technical rules."[2] I therefore disagree with my colleagues of the Majority who believe Buckhannon prohibits us from determining that the plaintiff was a prevailing party. That case does not establish technical rules that prohibit us from acknowledging that the plaintiff was the prevailing party. Let's face it. It's not that Buckhannon prohibits us. It's a

---

[2] Stephen N. Subrin, How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective, 135 U. Pa. L. Rev. 909, 917 (1987).

matter of choice. The Majority simply chooses to not extend its holding to different facts and precepts involving attorney fees in civil rights actions. I prefer to follow the history of this Court in expanding holdings in civil rights cases in new and fresh fact patterns. In so doing, I adhere to what our Court has been doing since 1939, and we carry forward the pioneer efforts of American jurisprudents from as early as the end of the Nineteenth Century.

## II.

The distance between the Majority and the dissent in this case can be traced through more than one hundred years of American legal history. As early as 1897, American courts were being chided for undue reliance on theoretical concepts. This was the philosophy behind European attempts to establish codes in every country on the continent. German Professor Rudolf von Ihering pioneered the work of replacing the European jurisprudence of conceptions with a jurisprudence based upon results. Our own thinkers, across the Atlantic Ocean, followed suit. In The Path of the Law in 1897 Oliver Wendell Holmes, Jr. gently admonished:

> I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage. The duty is inevitable, and the result of the often proclaimed judicial aversion to deal with such considerations is simply to leave the very

ground and foundation of judgments inarticulate, and often unconscious . . .[3]

By 1906, Dean Roscoe Pound of Harvard Law School was trumpeting the same theme. He described our system as conceptual jurisprudence, a slavish adherence to elegantia juris, the symmetry of law, and suggested that we resembled too much the rigid German Begriffsjurisprudenz.[4] This led him to call upon the American Bar Association to put an end to mechanical jurisprudence: "The most important and most constant cause of dissatisfaction with all law at all times is to be found in the necessarily mechanical operation of legal rules."[5]

In 1921, Benjamin N. Cardozo delivered the Storrs lectures at Yale, stating: "The final cause of law is the welfare of society. The rule that misses its aim cannot permanently justify its existence."[6] The same year, he seized the opportunity to put his new theory into practice by publicly rejecting blind conceptual jurisprudence. See Hynes v. N.Y. Cent. R.R., 131 N.E. 898 (N.Y. 1921).

These thinkers led us out of the methodology of conceptual jurisprudence—the view that a legal precept

---

[3] Oliver W. Holmes, Jr., The Path of the Law, 10 Harv. L. Rev. 457, 467 (1897).

[4] Roscoe Pound, Mechanical Jurisprudence 608, 610 (1908).

[5] Roscoe Pound, The Causes of Popular Dissatisfaction with the Administration of Justice, Address Before the Am. Bar Ass'n (Aug. 29th 1906).

[6] Benjamin N. Cardozo. The Nature of the Judicial Process 66 (1921).

should be followed to its dryly logical extreme, regardless of its effects on society. If Pound's 1908 warning against mechanical decision making did not create a new American school of jurisprudence, it at least spawned widespread respectability for social utilitarianism. It added a new dimension to law's traditional objectives of consistency, certainty and predictability—a concern for society's welfare, elegantly described by Professor Harry W. Jones as a legal rule that "contributes to the establishment and preservation of a social environment in which the quality of human life can be spirited, improving and unimpaired."[7] In all but a few areas of static law, mechanical jurisprudence has become more historical than operational, except for what the Majority does in this case.

III.

I turn now to legal philosophy, jurisprudence and jurisprudential temperament, because part of what divides the Majority and the dissent is a difference in views of these concepts.[8] When I speak of legal philosophy, I am addressing a very broad inquiry into what the relationship between individuals and their government, ought to be. In this context, the problems of legal philosophy are problems of normative political philosophy. So perceived, legal philosophy inquires into the problems of terminology, legal methods, the role of precedent, statutory interpretation, underlying rationale, the

---

[7]    Harry W. Jones, An Invitation to Jurisprudence, 74 Colum. L. Rev. 1023, 1030 (1974).

[8]    Ruggero J. Aldisert, Philosophy, Jurisprudence, and Jurisprudential of Federal Judges, 20 Ind. L. Rev. 453 (1987).

use of different types of authority, the efficacy of various controls and their operation in diverse factual scenarios, and the basic issues concerning the values that are implemented.

When I speak of a legal philosophy, I am addressing the specific answers to these basic inquiries forthcoming from very respectable thinkers, both in academia and on the bench. Each thinker probably articulates or at least demonstrates some particular legal philosophy. Hence, each of their individual solutions to myriad problems of judicial decision making is what I call a legal philosophy.

How a judge interprets the concept of "judicially sanctioned" depends on the legal philosophy the judge chooses to espouse. It cannot be seriously debated that the Majority's refusal to grant attorney fees in this case will limit future civil rights actions, discouraging the Congressional intent to provide attorney fees to civil rights plaintiffs under § 1988. It will discourage settlements, prolong litigation, and make work for overburdened district judges. Defendants will use complications in petitions for § 1988 attorney fees as bargaining tools in negotiations for calculating damages. Members of the Majority arrive at their decision by adhering to a philosophy of conceptual jurisprudence, an approach to the law that extends a legal precept to a drily logical extreme, regardless of the results upon society, and a philosophy that has found rejection in our courts for almost 100 years.

I turn now to the concept of jurisprudence. I perceive it as separate and apart from legal philosophy, in that it includes obligatory norms, both substantive and procedural, that shape and regulate the life of a people. This concept of jurisprudence more or less takes the form of an aggregate of legal precepts, a sort of by-laws of a given society or rules

10

that govern a given social order. It is law as it is, not as it ought to be. It is more properly a juridical science than a philosophy. Yet jurisprudence may also be considered "a body of traditional ideas as to how legal precepts should be interpreted and applied and causes decided, and a traditional technique of developing and applying legal precepts whereby these precepts are eked out, extended, restricted, and adapted to the exigencies of administration of justice."[9]

I find it necessary to distinguish between legal philosophy and jurisprudence. If a judge is truly following "a body of traditional ideas," he or she is probably observing the law as it "is" and not as it "ought to be." If we talk about law as it should be, we have entered the world of legal philosophy and philosophical generalities. Immanuel Kant suggested that the distinction existed in two simple Latin words. When we ask "quid jus?" we are seeking some general principle of philosophy to help us decide what the law ought to be. When we ask "quid juris?" we are seeking what already has been established as part of the jurisprudence.[10]

Unfortunately, the line between what the law is and what it ought to be is not always a bright one. As this case shows, one legal precept, pushed to the limit of its logic with inadequate consideration of the results, may point to one conclusion; another precept, followed with equal logic but emphasis on the results, may point with equal certainty to another conclusion. Or take the questions posed by Cardozo:

---

[9] Roscoe Pound, The Theory of Judicial Decision, 36 Harv. L.Rev. 641, 645 (1923).

[10] Immanuel Kant, The Philosophy of Law 43-46 (Kelly ed. 1974) (Hastie trans. 1887).

> If a precedent is applicable, when do I refuse to follow it? If no precedent is applicable, how do I reach the rule that will make a precedent for the future? If I am seeking logical consistency, the symmetry of the legal structure, how far shall I seek it? At what point shall the quest be halted by some discrepant custom, by some consideration of the social welfare, by my own or the common standards of justice and morals?[11]

It is here where that quality I call jurisprudential temperament, or the judge's intuition, comes into play. Temperament invariably influences the decision because it inclines the decision maker one way or another.[12] It is a major determinant in the case at bar in deciding the best interpretation of "judicial sanctioned."

If, as in cases like this one, the result is not predetermined and the law is not clear, the courts are faced with what Professor H.L.A. Hart called the "penumbral" issues, where the language of the legislation or a particular putative precedent of a court is general.[13] Whether a judge attempts to clarify a penumbral area of the law reflects a value judgment, and is indicative of the judge's

---

[11] Cardozo, supra note 6.

[12] The key word is "jurisprudential," not "judicial" temperament. The latter is descriptive of a judge's personality while sitting on the bench during a trial or on appeal.

[13] H.L.A. Hart, The Concept of Law 121-122 (1961).

jurisprudential temperament. Some judges have lower thresholds than others, and are more inclined to find solace in shades and fringes rather than the black-letter law. When this problem occurs, as is the circumstance of this divided Court, Professor Ronald Dworkin suggests that the decision depends "on the judge's own preferences among a sea of respectable extralegal standards, any one in principle eligible, because if that were the case we could not say that any rules were binding."[14]

The extent to which a court adheres to the legal precepts attached to the facts in <u>Buckhannon</u> rather than those present in the galaxy of our civil rights cases that have extended plaintiffs' rights, is not just a matter of logical analysis. In dealing with a putative precedent the judge's function goes beyond a perception of what was really intended; he or she exercises a choice. In the case at bar, it is a choice between: (a) conceptual jurisprudence, which preaches that a principle ought to be applied wherever it logically leads, without reference to results; or (b) a jurisprudence of results, which preaches "the establishment and preservation of a social environment in which the quality of human life can be spirited, improving and unimpaired."[15] Justice Walter V. Shaefer taught us:

> [M]ost depends upon the judge's unspoken notion as to the function of his court. If he views the role of the court as a passive one, he will be willing to delegate the responsibility for change . . . . If he views that court as an

---

[14] Ronald Dworkin, <u>Taking Rights Seriously</u> 89-90 (1977).
[15] Jones, <u>supra</u> note 7.

instrument of society designed to reflect in its decisions the morality of the community, he will be more likely to look precedent in the teeth and to measure it against the ideals and the aspiration of his time. [16]

\* \* \* \* \*

Through the years, it is said that in this Court we have dissent without dissension. It is in this spirit that I have expressed, respectfully, a failure to agree with a large number of my colleagues without in the least inferring any diminution of my great respect for each of them. And so, as the Marine Corps Hymn says, it is at this "clime and place" that a difference in legal philosophy, jurisprudence and jurisprudential temperament is demonstrated in the divergence between the Majority and dissenting judges' views upon applications for attorney fees under § 1988. That such a difference exists is not unusual; appellate courts are fashioned as multi-judge institutions so that different views may be publicly and forcibly expressed. What is unfortunate about the difference in this case, however, is the result that the Majority's holding will impose upon future civil rights plaintiffs.

---

[16] Walter V. Schaefer, Precedent and Policy, 34 U. Chi. L. Rev. 3, 23 (1966).